It was not, but we all appreciate that those conflicts do arise and the court's accommodation is usually resolved. There's usually, but I'll hear about that later, I suppose. You may have pleased the court. My name is Tom Wendell. I'm an assistant attorney general representing the individual state fire and assisted living regulatory officials in this matter. I'd like to reserve, if I may, five minutes for rebuttal. This case is about a regulated assisted living operator complaining about being regulated for purposes of fire safety of vulnerable adults. Speech in the context of being closely regulated is not protected speech. We are here under interlocutory appeal because the district court refused to grant qualified immunity for plaintiff's First Amendment retaliation claim. My argument will follow a two-part analysis that's prescribed by the Saussure decision. First, whether the speech is protected, and second, whether the law was clearly established as of 2003 when the events in question occurred. We maintain that the speech alleged here is not protected. Many federal and state regulatory programs involve important public concerns. Under Supreme Court, U.S. Supreme Court precedents, even if you complain about the draft or you complain about the IRS, you're still not immune from enforcement of those programs. Well, that's, you know, in terms of focusing it, I think we're all, we've all read everything and we're all aware on that level. It seems to me where the thorny issues where you run and where the arguments are focused is with Serrano-Gasco, you obviously run headlong into that. And so if that is clearly established and covers that, then it's sort of the end of the game. Now, I know you make other arguments, so I think we need to talk about that. And then you're also asking us, I guess one argument, you're asking us to import the Pickering test to the analysis here. And so Serrano didn't expressly do that. So if Serrano didn't expressly do that, and you have to import that to prevail, it just seems to me that that presents a difficulty. But, you know, that sort of centers it. So I think you need to talk about Serrano and you need to talk about Pickering. Thank you. It is Pickering, Connick and Garcetti, the employment, the principal employment cases that set those up. The Serrano's case, which was relied on by the trial court here, simply doesn't establish precedent for whether the speech is protected or not. It is specifically stated in that decision that it simply wasn't disputed by the parties. And so that decision does not address the question of whether the speech should have been protected. What's your best case that Pickering applies to licensees? Well, that's what you're saying. Pickering applies to licensees. So if I say something bad about DMV and they decide to start enforcing all kinds of ticky-tacky stuff against me to affect me, well, I'm a licensee. They can do it. They can retaliate against me if they want. Right? We have cited a district court case where the case of Coward, a fairly recent case where, in fact, it was a case where, in a regulatory context, the employment-type scrutiny over whether the speech is protected was, in fact, applied by the district court. And I want to emphasize, with respect to the burden, what is not shown here is any precedent clearly and plainly holding, when confronted with the question, that in the regulatory context, the important public interest served thereby. Here we're dealing with mobility. You're saying, I mean, your position basically is that if I have the misfortune of having to have a license to practice law, for example, the regulatory body can retaliate against me if it wishes on the basis that I said something nasty about the way the case was handled. I just don't get that. It seems to me that when Pickering and company were put together, they were actually an advance of constitutional rights for employees, not a retraction, but an advance. Before that, you followed the Holmes dicta or aphorism. You have the right to say what you want, but you don't have the right to work for the government. So there's the Pickering area. So we try to adjust it because these people work for the government. How you slide that over into the ordinary citizen, simply because he has to be licensed, is a great leap, it seems. I can't imagine how somebody could assume that that would just happen. It's a good question, and there are a few concepts that I'd like to respond to in that question. First of all, the nature of the speech that you're talking about, your very short example of protesting to the bar, I presume as a member of the bar. The nice thing about the employment standards that are out there is they allow us to assess that speech. Are you making that speech for purposes of overall public concerns, or are you making that speech for your own interest? I'm making it for my own interest. I say this stinking bar association, this stinking state bar has commenced an action against me simply because I stole money from the trust fund, and that's illegal and immoral and indecent, and I should be able to borrow money from the trust fund if I want to. It's all personal. I'm making a personal attack on them because of what they did to me personally, just like a step. I think you're suggesting that the bar can then retaliate against me. We've got to assume retaliation. Can retaliate against me because I had the temerity to make a statement attacking the Board of Bar Governors, etc., etc. That's a really great bite out of First Amendment, it sounds like. Well, we have to balance the interests at stake. I don't know that the bar association has the interests of health and safety of adults with mobility impairment. Well, but the state does have that responsibility, and let's talk about when the state started getting excited about it. It was after, what, two people burned up or something? Eight people died. Before that, the state had a responsibility on that, and they were moving glacially on that, and then the spotlight comes on. So the state had that responsibility back then, and they weren't doing anything about it. They waited for a tragedy before they did anything, and so, yes, you did have that responsibility, but I'm sure it was perfectly just as obvious then that if you have people that can't move and you don't have sprinklers, that would be a danger, but it became really obvious when eight people died. It did, and it wasn't the day after that occurred that the enforcement activities took place. But that certainly put the spotlight on, uh-oh, we better do something. I mean, I've worked for government, too. I know how it works. I mean, government tends to be much more reactive than proactive. Yes, but in the reaction, there was a considerable period of time between 1998, when those fires occurred, and 2005, when the fires occurred, and 2003, where it wasn't an immediate regulatory pound of the gavel in saying everybody shall instantly conform and install fire sprinklers. There was a long period of time where there was a subsidy program to encourage people and bring them along, and it wasn't until four years later that the requirements actually, the regulations were changed. But didn't Mr. Kilkelly try to conform to the regulations? And going back to Judge Fernandez's point, really, he didn't. We're talking about one individual, Mr. Kilkelly, and basically it was his personal, I guess, dispute with the entity, the regulatory entity, about the homes that he was told that he had to comply with. And how is that a matter of public concern, to go back to your analogy, what he's complaining about? Well, we're talking, as Judge Fernandez's example, wrapped up and synopsized his conclusion as it's a purely personal concern of my beef. Correct. Wasn't it? And that is what I hear you asking, and why is that, or why should that not be protected? Correct. What would that do to the regulatory program, if in any regulatory context, the draft, the IRS, by coming forward and by saying, I don't like the way you people operate, and therefore, because I have spoken against you, you can't take enforcement against me, not for the speech itself. No, it doesn't say that you can't. It says that you can't retaliate against people that don't do, you know, it says you have to treat people the same, or you have to have some best practices as far as you do. The flip side of it is, why would, you know, I mean, when you're asking a court, essentially you're asking us to import pickering, in terms of which would give those that regulate sort of unfettered ability to do, you know, say, apparently Mr. Kilkelly, when the attorney came in, he was, like, not very popular, and said, oh, yeah, we know who that guy is, you know, he's sort of a pain in the you-know-what, and it's the same type of thing as, you know, when I was a prosecutor, you know, why won't this guy plead guilty, he's so guilty, he's a pain in the, you know, you-know-what, but, you know, he has that little old pesky right to a jury trial. I mean, people still have a right to whatever due process that they're entitled to, and all that the state would be in a position of, is they just have to treat people fairly and give them whatever their rights are. It's not, you know, I mean, you want to be immune from criticism, and then do whatever you want. And wasn't he trying to comply? I mean, didn't he make an effort to comply, and he was retaliated against? I mean, in fact, he was in settlement discussions, when all of a sudden the license was pulled. That's not quite accurate, Your Honor, and, in fact, one of the things that the construct that has arisen in the employment context gives us is an ability to distinguish between what did happen here, the phone call from the lawyer saying, we're not going to comply with the conditions on the license, we're not going to install sprinklers, and that was the statement that happened before the emergency suspension occurred. And only after the emergency suspension occurred did the lawyer say, you know, we're not going to comply with the conditions on the license. Was there then some vague acquiescence in that we will eventually at some point in time install sprinklers? We'll move towards that direction. But the history with that person has to be considered together with that vague admission. But the construct that we have, Garcetti, Connick, and Pickering, and balancing these interests, allows us to distinguish between folding your arms and saying, I am not going to register for the draft, I am not going to file my tax returns, or I am not going to comply with fire safety regulations. That is speech. How do you separate that speech from something that may be more worthy of protection through a retaliation claim? What standards do we have to do that? We need standards to do that, because if by coming to the content of my speech is, I am not going to comply, then we have a serious disruption of an important governmental safety program. Because if anybody has to comply. I don't think anybody is saying that you don't have to comply because you said I'm not going to comply. That's not the question. The question is whether, because of a number of things he did, contacting the legislature, contacting the newspapers, et cetera, et cetera, you folks, and it may not be true, because of that, you decided that you would enforce certain rules against him in a way that you would enforce them against nobody else, at least up to them, enforce them against nobody else. This is what the evidence, if we accept his evidence as true, and that's what we have to do or else you're not even here, correct? We have to accept his position as true, correct? Because you can't even be on appeal. The position that's supported by evidence, that's right. He's entitled to all inferences at this point. If it is true that what your folks decided was we're going to jump on this guy because he's had the temerity to question the way we're going about it, and he's even gone to the legislature and he's gone to the newspapers, if that's what you did, that's different from what you want to argue to us about, you know, can't we enforce regulations? If I make a police officer angry at me, and so he starts following me around the streets, and, you know, I just had to go pass one of those exams, and I've read through the book at Police of California, we make mistakes every day. So he follows me around the street and he gives me all the tickets, and I'm entitled to those tickets, I mean, I did it, all right, but nobody else in the citizenry is treated that way. I think I can allege retaliation, and that's what this guy is saying. He's not, I mean, that's what I see, this case has, this is where this case has to turn. If he's going to win, he's got to show you did it because, and you wouldn't have done it otherwise. Which you might win, but in the posture that you are right here, in order for you to win, essentially, the case that you, essentially, Pickering has to win, it has to be the law, and if Pickering is the law and applies as you state, and that's clearly established, then you should win, right here. Well, Pickering-like analysis, there is certainly... Well, if that's the law, then you should win right here, but you're asking us to, essentially, but then you've got to ask us to import Pickering, so, which tells me that's not the law, and then if Serrano or Serrano-Gasco was clearly established law, then all it is at this particular juncture, you're not entitled to qualified immunity. That's, that doesn't mean they win, it just means you don't get qualified immunity. The law is certainly unsettled. If you presume that the speech is protected, if under whatever standards you're going to apply to the speech it is protected, you still have a causation issue, because you're not in a simple direct cause and effect situation here, much like the retaliatory prosecution context. How do you separate motivations? How do you separate physical observations of deviations from the law from suspected or potential motivations? Do we have a statement here that says, I'm going to get you, as most cases in that context... But isn't timing really important? I mean, timing, and that's, that was what Judge, the judge below relied upon, is that everything that happened to this guy, Kilkelly, happened in a short period of time, and the reasonable inference, and what he found, was that because of all these things he did, he was going to get you. And he was going to get you. And so, he did in a short period of time, and soon after, the license was suspended. But we put in our reply briefing a discussion about the fact that timing alone simply doesn't get you there to an inference of motivation. No, but it's an important factor. And connecting sentiments between people who interact with one another on a regular basis, saying that regulators have to like the regulated people, is quite a leap. You've retaliated against me when you enforce facially valid regulations for observable violations, then the regulatory program is going to be perverted. Do you want to save the balance for a rebuttal? Good morning. Good morning. So did your case resolve? It did resolve, but I didn't... We were all surprised. It's always a surprise. But aren't you glad that we didn't let you vacate oral argument? I am glad. Actually, it worked out well. Sometimes things do fall into place. But speaking of things falling into place, when you're developing an oral argument for a body like this, you try to come up with a theme. And I couldn't decide whether or not Mr. Kilkelly found himself in a Kafka novel, Catch-22, or just regulators gone wild. And we are dealing with summary judgment standards in this case, and what we have to do is understand that this is an interlocutory appeal. And they're entitled to it. The whole point of qualified immunity is, if it's wrongfully denied, it's to make you not have to go to trial. That doesn't change any of that. I mean, we don't have any problem with that qualified immunity where it's appropriately granted. But I would point out there were other rulings that the district court made that we do not disagree with with respect to other issues, because we don't get the interlocutory appeal. Those will have to wait for another day. But doesn't this go back, then, to the district court, and isn't there another part to this whole thing? Would they have still made the same decision? They get that argument, but I think if you look at the facts in this case, the facts certainly would belie that assertion. Well, don't waste time on that, because that's not before us. Your Honor, I would point out that some of the representations made by the state in this case are simply inaccurate with respect to factual sufficiency issues, which they are really discussing. With respect to whether or not the Pickering balancing test would apply, even if we assume arguendo that the Pickering balancing test does apply, they've done nothing wrong. They're just trying to indicate that they ever put the Pickering balancing test at issue. If you actually look at a case that I had before this court called Shadow Beyond v. Gaspard, which is, I believe, in either 96 or 97F2nd, one of the issues when dealing with Pickering is whether or not the government put the balancing test at issue. Simply for a lawyer coming up several years after the fact and arguing that we have the right to balance things is not an indication that at the time the events were occurring that a balancing occurred. What do you mean by that? You're telling me that the people in the office, the ordinary guys going about their work, they're supposed to sit down and say, no, let's see, I think I'll apply the Pickering balancing test. What is the strength of the public interest here versus the importance to the government of continuing this program? You're saying that if they don't do that, there's something wrong when a lawyer raises it on appeal? That is exactly my position, Your Honor, because ultimately if you look at, for example, I think it's the Roe case, which ultimately went to the Supreme Court, and they talk about the standards applicable to First Amendment claims in the public employment context, again, a big assumption that applies, there are two ways to defend the case. One is to defend it based on I didn't do it. One is to defend it based on we have the right to do it because your speech upset the apple cart. There has to be some factual basis to make that argument. In other words, at the time you spoke, you said something that was so destructive to our enterprise that we had a right to suppress your speech or retaliate against you. You made a statement to the press that was inappropriate, false, and misleading on an issue that we have investigated over and over again and we know it's not true. You made a statement that was so destructive to the personal relationship between you and your supervisor, we have no choice but to fire you because we cannot continue on. There has to be a factual basis to do a Pickering balance. It's an either-or defense. In this instance, they made a defense based on denial. His speech had nothing to do with our actions. Well, obviously your cleanest argument is that Serrano-Gasco covers this situation. It was clearly established and therefore they don't get qualified immunity, right? Correct. Serrano-Gasco was a 1989 decision dealing with similar types of facts, retaliation against someone in a regulated industry. Now, I think they make some distinctions that they say, I guess, one was a suspension case and yours is a suspension and revocation, I guess, and so they make some distinctions and they say that Serrano, it wasn't clear that it covered this. Well, I think the distinction between suspension and revocation is some degree a distinction really without a difference because they would both fall under the rubric of an adverse governmental action. Whether your business is suspended or destroyed, which was done here, regulatory power used to destroy a business for improper purposes. And I think they also say that because Pickering, those cases were cited in the Serrano case, that the fact that the court didn't say anything that they necessarily adopted that standard and that... There is, I believe, a reference to Pickering and Serrano, but they did not apply any balancing because I don't think, as in this case, they haven't properly put it at issue based on a factual basis. In other words, you can't just say, well, the speech was disruptive, or we made a calculus that the speech was potentially disruptive. At least you have to have someone come forward and say that and indicate they made that decision. That's not the case here. They're indicating, despite, and I do disagree with the district court with respect to the strength of the evidence in this case, though, as this case is done on a shortened discovery, we were given truncated discovery just to address the qualified immunity issue, and the court recognized the limitations that you provided. And the court said if later, if they can establish certain other things, that maybe there can be another summary judgment, I guess. Well, I suppose, but they shouldn't win. Well, everyone always says that. Again, this is very limited, and this is a factually complex case. I've given you some documents that I think would aid the court to understand why this is a good retaliation case, and the idea that they have even the slightest opportunity of prevailing are pretty slim. Well, now, the appellant is, they're obviously making the argument that because they are, you know, they do have the public safety, you know, they have that, their responsibility, and obviously it is a great concern that, you know, immobile people would be in a situation, they can't do anything to defend themselves. And they basically asked the court, in my view, to require that a regulated entity demonstrate that its speech addresses a matter of public concern and satisfies causation standards for public employees in order to be protected by the First Amendment. And they listed a parade of horribles if we don't require that it be of public concern. What is your response to that? My response to that is that every circuit that has actually considered the issue directly, in taking the public concern, the employment standards, and trying to engraft them on otherwise citizen speech have rejected those standards. And, you know, the I can allow of opinion is a very good example of it, someone speaking out at a public meeting but also engaging in challenging their ability to regulate his property. And then trying to say that because he spoke out, he was speaking out, that all of a sudden these limiting factors applied to his speech was rejected. But isn't this a matter of public concern? The fact that this gentleman is running these homes that people that may not be ambulatory are living in and because of the fire that happened in the late 90s, something like that could happen here? You have to understand the factual background of this case to respond to that question, I would suggest. When this fire happened in Arlington, they went to the legislature and they asked for a mandatory fire spread. That's all in the briefs, I understand. They rejected that issue. They issued a guiding letter, which is Exhibit 1 in the materials I provided you, which very clearly indicated to Mr. Kilkelly that he could have semi-ambulatory and non-ambulatory people on the ground floor of his building. They changed the rules on them. And if you actually look at the emails between the fire marshal personnel, beginning, and that's Exhibit 3 in the materials I provided you, they changed the rules completely. One individual named Mr. Van Back felt that, no, we're not enforcing the laws correctly. If you look at the first page of the Exhibit 3, there's a very clear indication that after March 4th, they understood that Mr. Kilkelly, under how they were interpreting the regulations, was doing everything appropriately. They changed the rules. They can change the rules as long as they change them in general, correct? They can change the rules so long as they do so in a reasonable manner. If you've been telling somebody for four years, passing every single one of their fire inspections, that on one day, oh, all of a sudden you've done everything wrong, then I expect them to challenge that and at least provide a reasonable opportunity to come into compliance. That's your due process kind of argument, but this isn't a due process appeal. The question is, let's say they did arbitrarily change the rules for everybody in the state, and because they were captured by hubris, they rushed out to every nursing home in the state and shut them all down. You wouldn't be here on this appeal, I assume. There would be certainly other issues that I think need to be addressed. But what I'm saying is this appeal is the only reason would be, for example, you changed the rules because you knew that I spoke out, and therefore you decided to change the rules to get me. Or after you changed them, I spoke out, and then you decided to get me for that. That's got to be your case, right? And that's the problem they're having, and that's why Judge Callahan asked you that question. Because they're saying, you know, this guy's saying just because I squawk, they can't enforce the rules against me without catching a lawsuit. That's what they're saying. Well, it's certainly not that simple, and I would humbly disagree with the basic proposition that if they decide one day to change the rules, pick you out, and why is he being picked out for the initial enforcement action where they just pound you with regulation, shut you down, and then go after everybody else? So what? What's that got to do with speech? It has to do with speech. What if you hadn't said anything? If he hadn't said anything, they probably would have picked him out to pound with regulation and destroy his business. He wasn't in compliance, though, was he? He was in compliance up until the day they said he wasn't because they changed the rules. Now, it is a part of the case, and it's not just a due process argument, and it does go to qualified immunity and a retaliatory motive. Because when you're dealing with conduct that is facially unreasonable under the circumstances, that is providing you an indication that you're having an unreasonable application of the law and that there's some motivation behind it. Now, why would they, you know, if you look at it, they're having this internal debate like, well, we've done this before, but no, we actually should do it this way. They give Mr. Kilkelly literally less than 10 days to comply. He's begging for meetings. He's trying to do everything possible to comply. There's directives within the fire marshal's office that nobody's supposed to talk to him. One of the e-mails that's in the packet I provided you is an e-mail saying, you know, gee, this guy's doing everything possible to comply. Why are we busting his chops, basically, and not helping him? Now, that goes to what is the reasonable conduct here? Did these people even care about the law? They wanted to get him, and they wanted to get him because he's somebody who had challenged them administratively on care issues. They wanted to get him because he had gone to their legislatures, and this was personal to him. Now, there's an e-mail that talks about, hey, we have a history with this man, but he's only been in the business since 1999. The e-mail is being issued in 2003. His homes are quality homes. There's really no major problems with him except the fact that he had taken an administrative appeal and was challenging them in that setting. Then he wants to get this Lakewood facility built, and ultimately, if you look at the way this was treated compared to the way the successor to his business was treated, totally one's one way, one's the other. Why? Because they wanted Mr. Kukele to be punished and out of that facility. When it came to him opening a new facility, they strictly apply the rules. When someone's taking over his business, they lax up the rules. I mean, there's so many indications that there was an operation of improper motive here that this case is extremely strong. But we are dealing with the legal issues, and I would suggest that if we survey the law as it exists at the time and as it exists now, the RK Venture case doesn't apply a public concern test to the speech at issue in that case. Sorano-Gasco, no public concern, no pickering. Eichenlau, which is the case the court relied on in this matter, literally says you cannot import those standards to citizen speech, even if someone's in a regulated industry or something that's subject to regulation. The Monteiro case v. City of Elizabeth, you can't punish a city council member for saying something. Well, they didn't import, even though a city council member arguably is a public, could be qualified as something analogous to a public employee, they said no, you don't import employment standards. Sixth Circuit, Jenkins v. Rock Hill Local School District, parent's speech about our child being treated. It doesn't have to be about a matter of public concern. There's no balancing. She's a citizen. She has a right to speak. Gable v. Lewis, tow truck operator. He's not being treated favorably. Does he have to prove that his speech is about a matter of public concern? No. Let me interrupt you there. Going back to the retaliation issue itself, I think you mentioned something about you disagreed somewhat with Judge Lasnik in his findings, or is there anything that you want to bring to our attention? I disagree to the extent that I think he does an evaluation where he says, well, because this is just a qualified immunity issue, you've had limited discovery, this might not be enough to get you to trial, but it will get you past this issue. I don't remember the exact language used. I absolutely totally disagree with that. The only issue before us is the retaliation issue at this point. Correct. That's all of it because of the vagarities of the way the rules work. That's all we can do. But I disagree with that proposition. So what do you want us to do about that? What do you want us to do about that? Pardon? What is the significance of that on this appeal? Other than the fact that I believe, you know, I suppose if I think it's grousing. It's speech. Your speech? I'm protesting. I don't protest. But you agree with his findings as to what led to the what he based his finding of retaliation on? Yes. Yes, the temporal relationships are important, but I think it's a little richer than that. I think you have disparity in treatment, and that still is relevant to whether or not someone is being a victim of reprisal, why is he being treated differently. Well, let's just say if right here, and I'm speaking hypothetically, if we decided to write an opinion that did import Pickering into the analysis, how would that affect you? It wouldn't, because they wouldn't put it at issue. And even if it did, you know, how did his speech disrupt anything? He just spoke out while trying to comply. If we did import it into it, though, wouldn't it say that wasn't the law at the time anyway? Oh, okay, from a qualifying perspective. Yeah, that's what. See, because they're arguing that was the law at the time. Well, even if it was, it doesn't make any difference as far as outcome to the extent that, you know, on balance, the speech would have been protected. So even if we assume we take all these public employment issues and plug them in here, you still have to do what they did. I think it's the Freitag opinion. You have to analyze each part of the speech and make a determination as to whether it's protected or unprotected. Some of the speech clearly would be protected under existing law standards. Wouldn't there be a balancing test also? Wouldn't that have to apply? I think that ultimately is a factual issue, and it's an either-or defense like I mentioned earlier. But even if they did, they would have to come up with a factual basis for the balancing other than throwing their arms up and say, we have the right to regulate. You know, fire deaths are horrible. Well, of course they are. The difficulty with that position, if we got to Pickering, your problem is, I think, that there are a number of cases out there in the Ninth Circuit that say, you know what, if it's a matter of Pickering balancing test, they probably have qualified immunity, period, because nobody in the world can figure out, et cetera, et cetera. Do you know that line of cases? With school boards and such, they say, well, you know, they couldn't really know, because Pickering has this very delicate balancing, et cetera, et cetera, and therefore they get qualified immunity. That case actually, that whole line of cases actually was generated out of a case called Moran v. State of Washington, which I lost. Mr. Lynch won. But Moran had its day, and Moran had its day for about two years. There's Moran, Brewster, and a couple other cases during that, I think, about 0-2, 0-3, 0-4 period. And Moran has not been applied as strictly as it initially started out. It's a little old Ninth Circuit case, though, now. You see trends. And when you look at cases and you say, oh, okay, it's going to go this way because of this, and then it kind of trends over here, the trend clearly, in the Ninth Circuit at least, has been to not necessarily find that to be a dispositive issue. And ultimately, even if you're engaging in this balancing, sometimes the balance is so overwhelmingly in favor of the speech that you can't just say it's uncertain. At some point you have to apply the law. And there's a real danger to saying the balancing test creates complete uncertainty at all times. It's because of the potential for incredible mischief. What's the incentive to speak out if your rights are unenforceable? We are talking about the First Amendment, not the Second, not the Third or the Fourth, or the Tenth or the Twentieth. This is the First Amendment. If we don't find that to be the highest protection at the highest level, it's troubling. It threatens our democracy. All right. Your time has expired. Thank you for your argument, unless there are any further questions from the panel. Thank you. A balancing test like the Pickering balancing test is an important judicial balancing that has to be done. I don't believe it is necessary, and we're not asserting that it's necessary for that to be a conscious or evidentially preserved part of the decision-making process at the time of the action. What is balanced is the impediment of the governmental interests at stake. But that's what you're asking us to do, aren't you? Yes. In this situation, us. That's right. If we wrote an opinion and expressly imported Pickering, how would that affect the results in this case? Well, what that would certainly establish. Then that sort of tells me if I write that opinion right now, it wasn't the law back then. It tells us the law was uncertain back then. That's why I would write an opinion, because it's not the law, and now I'm going to make it the law. I have other things to do with my time than write opinions. I mean, I could also write an opinion and say expressly Pickering is not imported here. And that kind of puts another nail in the coffin. It adds clarity to the law, is how I would put it, rather than changing the law. And what we have in the qualified immunity context is a burden on the part of the plaintiff to show that the law was, in fact, clearly established at the time of the activities in question. So if we write a Pickering opinion, importing Pickering, then that, in your opinion, that would mean that the law was unclear, and therefore you win. That's correct, Your Honor. What that balancing test suggests we ought to do is consider whether every disagreement between regulators and the regulated entities is going to become a constitutional matter. We're taking a context with an important public concern, the fire safety for mobility-impaired senior citizens who depend on the care facilities they are in, and we have to consider the importance of that program versus the disruption that would occur if every disagreement became a constitutional matter. And I don't think it takes a leap of logic to suggest that if we didn't need regulations ñ excuse me. We need regulations because some people otherwise wouldn't comply, and that necessarily puts us in an adversarial situation. The courts also consider in this balancing what kind of remedies are out there. In the Eichenlaub case, a public forum case where somebody was simply ejected, and as prior restraint on speech, has no administrative remedies. Here, in a regulatory context, as with the IRS, we have administrative remedies, and the record is clear that those were followed here. And the courts certainly recognize that not every disagreement in the workplace, and we assert that not every disagreement in the regulatory environment ought to be a constitutional matter. Thank you. All right, thank you for your argument. Both gave a good argument to the court. This matter will stand submitted at this time.
judges: Fernandez, Callahan, Gonzalez